UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WORLD FINANCIAL GROUP INSURANCE AGENCY,<br><br>Plaintiff,<br><br>v.<br><br>ERIC OLSON, et al.,<br><br>Defendants. | Case No.  24-cv-00480-EJD<br><br>**ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR EXPEDITED DISCOVERY**<br><br>Re: ECF Nos. 16, 17 |

Plaintiff World Financial Group Insurance Agency ("WFG") brings this suit against Defendants Eric Olson ("Mr. Olson") and Sandra Olson ("Ms. Olson") (collectively, "the Olsons" or "Defendants") alleging Mr. Olson breached his contract with WFG and misappropriated confidential business information.  The complaint, originally filed in Santa Clara Superior Court on January 25, 2024, includes seven causes of action for (1) breach of contract, (2) tortious interference, (3) civil conspiracy, (4) fraud, (5) unjust enrichment, (6) conversion, and (7) unfair competition in violation of California Business and Professions Code Section 17200.  ECF No. 1-2.[1]  WFG seeks injunctive relief, monetary damages, and attorneys' fees and costs.  *Id.*  On January 26, 2024, Mr. Olson removed the case to this Court.

On January 25, 2024, Ms. Olson and her company, Global Financial Impact, LLC ("GFI") filed a complaint against WFG in this District seeking injunctive and declaratory relief, attorneys' fees, and costs.  *Sandra Olson v. World Fin. Group Ins. Agency*, No. 24-cv-00477-EJD (N.D. Cal.), ECF No. 1.  The next day, on January 26, 2024, Mr. Olson filed a separate complaint against WFG pleading claims for (1) unfair competition in violation of California Business and

---

[1] Unless otherwise indicated, all references to "ECF No." denote filings in this action, *World Fin. Group Ins. Agency v. Eric Olson*, 24-cv-00480-EJD (N.D. Cal.).

Professions Code Section 17200, (2) tortious interference, (3) conversion, (4) breach of contract/covenant of good faith and fair dealing, and (5) declaratory relief. *Eric Olson v. World Fin. Group Ins. Agency*, No. 24-cv-00481-EJD (N.D. Cal.), ECF No. 1.

On January 29, 2024, WFG filed the present motion for temporary restraining order (ECF No. 16 ("TRO")) and motion for expedited discovery (ECF No. 17). Both Mr. Olson and Ms. Olson filed oppositions to the TRO on January 31, 2023 (ECF No. 26 ("Opp."), 27 ("Ms. Olson Opp.")), and WFG filed a reply on February 4, 2024 ("Reply"). On February 5, 2024, Mr. Olson filed an opposition to the motion for expedited discovery. ECF No. 43. WFG filed a reply in support of its motion for expedited discovery on February 14, 2024 (ECF No. 60), and Ms. Olson filed a reply regarding the TRO on the same day (ECF No. 61).

On February 7, 2024, the Court held a hearing on the TRO and the motion for expedited discovery and ordered supplemental briefing. ECF No. 52. Both parties submitted the requested briefing on February 14, 2024. ECF Nos. 58 ("Olson Suppl."), 59 ("WFG Suppl.").

The Court related the three actions involving WFG, Mr. Olson, and Ms. Olson on February 5, 2024. ECF No. 46.

## I.   BACKGROUND

### A.   WFG

WFG is a multi-level marketing ("MLM") company that sells insurance products through a network of insurance agents. ECF No. 16-1, Decl. of Todd Buchanan ("Buchanan Decl.") ¶ 2.

In addition to offering insurance products to customers, the agents recruit other insurance agents to work under them, known as "downline agents," who can then recruit more agents to their downline. *Id.* ¶ 4; *see also* ECF No. 29, Decl. of Eric Olson ("Mr. Olson Decl.") ¶ 3. This structure, an agent's downline of recruits and their successive recruits collectively, is commonly referred to as a "hierarchy." Buchanan Decl. ¶ 4; *see also* Mr. Olson Decl. ¶ 4. Under the hierarchy structure, insurance agents receive an override, which is a percentage of each of their respective hierarchy agents' commissions. Buchanan Decl. ¶ 4. In other words, the original agent is compensated for sales by their downline recruits and any sales from those agents' downline recruits. Mr. Olson Decl. ¶ 3. According to Mr. Olson, "the larger and more successful an agent's

United States District Court
Northern District of California

1  hierarchy, the more compensation they are entitled to receive—and the more money WFG makes

2  from the agent's business." *Id.* ¶ 4.  And "[a]n agent's ability to obtain bonuses and capacity to

3  elevate to higher tiers is through recruiting agents." *Id.*

4      The insurance agents directly solicit the public to become customers of WFG and the

5  product providers, and the agents can inherit customers from other agents in their hierarchy.

6  Buchanan Decl. ¶ 5.

7      When first signing up with WFG, agents are required to sign an "Associate Membership

8  Agreement" to act as independent contractors for WFG.  Mr. Olson Decl. ¶ 5.

9      **B.    Mr. and Ms. Olson**

10     In 2003, Mr. Olson entered into a contract with WFG to work as an agent (the

11 "Agreement") selling insurance.  Mr. Olson Decl., Ex. 1.  He has signed an annual renewal of

12 WFG's Agreement each year since 2023.  *Id.* ¶ 6.  During his 20 years with WFG, Mr. Olson was

13 successful recruiting agents to work under him and sell financial products available on the WFG

14 platform, such as life insurance.  *Id.* ¶ 8; *see also* TRO 3.  Mr. Olson owns and operates Pinnacle

15 Leadership Financial Agency ("Pinnacle"), which is a co-brand "reviewed and approved by

16 WFGIA" and through which he operates his downline.  TRO 3.  Mr. Olson grew the company to

17 over 20,000 agents.  Opp. 3.

18     Ms. Olson joined WFG as an insurance agent in 2013, where she met Mr. Olson—her now

19 spouse.  Ms. Olson Decl. ¶¶ 3–4.  In 2014, Ms. Olson "decided [she] would transition from selling

20 insurance products as an agent to managing and running" Mr. Olson's company, Pinnacle.  *Id.* ¶ 5.

21 In 2020, Ms. Olson alleges that WFG "stopped recognizing the supporting spouse's role on its

22 website and promotional materials" and "stopped permitting the supporting spouse, like [her], to

23 present speeches at various WFG conferences." *Id.* ¶ 8.  It was these changes, she explains, that

24 "made [her] want to play a more active role in selling insurance products and creating [her] own

25 source of income." *Id.*

26     In 2022, Mr. Olson decided he wanted to leave WFG for various reasons, including

27 because WFG allegedly "routinely changed its compensation structure to disadvantage its agents."

28 Opp. 4.  Prior to leaving, Mr. Olson wanted to transfer his "code"—his unique code that entitles

1    him to commission from his downline agents—to his wife, Ms. Olson.  *Id.* at 4.  But when he was

2    allegedly blocked from doing so because of a sudden change in policy enabling spousal transfers,

3    Mr. Olson then tried to sell his code.  *Id.*  Mr. Olson claims, and WFG does not appear to dispute,

4    that WFG changed its policy to prevent that transfer, too.  *Id.*  Mr. Olson was thus "left with no

5    ability to leave WFG and receive any compensation for the value of his business."  *Id.*

6           **C.    Global Financial Impact, LLC**

7           In October 2023, Ms. Olson resigned from WFG and started a new company "to sell

8    insurance products," called Global Financial Impact, LLC ("GFI"), which is incorporated in

9    Wyoming, registered to do business in Texas, and has an office in San Jose.  *Id.* at 5; TRO 3–4.

10   Ms. Olson hired Matthew Welsh, "an industry expert who had left WFG over two years prior," to

11   join her.  Opp. 5.  Together, Ms. Olson and Mr. Welsh developed the structure of GFI, created the

12   curriculum, materials, presentations and training schedules.  *Id.*  She recruited four other agents—

13   one who was unaffiliated with WFG, and three whom had left WFG over two years ago.  *Id.*

14          The initial team of five agents, including Ms. Olson, "brought in other agents, who in turn,

15   brought in other agents."  *Id.*  While Ms. Olson claims she "had not knowingly solicited any

16   agents she understood to be under contract with WFG nor had she instructed any GFI agents to

17   solicit WFG agents," WFG strongly disputes this.  *Id.*; *see generally* TRO.  According to WFG,

18   Ms. Olson, with the help of Mr. Olson, used her access to WFG's confidential information "to

19   determine which high-performing insurance agents to target and what leverage to assemble before

20   approaching them."  TRO 4.

21          **D.    The Agreement**

22          When first signing up with WFG, agents are required to sign an "Associate Membership

23   Agreement" (the "Agreement") to act as independent contractor for WFG.  Mr. Olson Decl. ¶ 5.

24   Both Mr. Olson and Ms. Olson signed the Agreement as part of their employment with WFG.

25   *Id.* ¶ 6; Ms. Olson Decl. ¶ 5; Buchanan Decl. ¶¶ 19–20, Exs. 1, 2.  The Agreement contains "non-

26   solicitation and confidentiality clauses."  Buchanan Decl. ¶ 12.

27          The Non-Solicitation Provision states:

28          Except as prohibited by law, during the period that Agent is an Agent of WFG

United States District Court
Northern District of California

4

and for a period of two (2) years following the termination of this Agreement for any reason, Agent shall not, either individually or in partnership or jointly or in conjunction with any other person or entity, as principal, agent, consultant, contractor, employer, employee or in any other manner, directly or indirectly, solicit, induce or entice away or in any other manner persuade or attempt to persuade any individual who is a current agent of WFG and with whom the Agent had business contact with on behalf of WFG or its affiliated or related entities, to terminate or alter their agent relationship with WFG to join a competing organization.

*Id.* at § 2.15.

> The Confidentiality Provision states:

Agent will not use, disseminate or reveal, other than on behalf of WFG as authorized by WFG or the Product Providers, any Confidential Information or Trade Secret of WFG or of the Product Providers, which Agent has or hereafter receives. Agent agrees that immediately upon the termination of this Agreement, Agent will return all documents, files and lists containing any Confidential Information or Trade Secret to WFG and the same shall not be copied or duplicated.

*Id.* at § 2.16.

> The Non-Disparagement Provision states:

The WFG Agreement prohibits disparaging WFG or its affiliates: Agent shall not do anything that will damage the business, good name or reputation of WFG, Affiliated Companies and/or their respective officers, directors, and employees.

*Id.* at § 2.17.

### E.    Events Giving Rise to the TRO

WFG has submitted numerous declarations from individuals attesting to events WFG argues demonstrate the Olsons' "conspiracy to raid" WFG's agents for GFI.  At a high level, WFG argues that beginning around January 2023, the Olsons used knowledge they acquired through WFG to "determine which high-performing insurance agents to target and what leverage to assemble before approaching them."  TRO 4.  One declarant, Nicholas Bosley, who worked on Mr. Olson's team with Pinnacle, describes how he showed up to an office to meet Mr. Olson on January 2, 2024, in San Jose and was greeted with an NDA.  ECF No. 16-1, Bosley Decl. ¶¶5–9.  Mr. Bosley explains that Mr. Olson "described how horrible he thought WFG had been" and how if Mr. Bosley passed away, Mr. Bosley's wife "would have gotten nothing from [his] work with

WFG." *Id.* ¶¶ 11–12.  Mr. Olson also allegedly told Mr. Bosley that WFG was "stealing" from agents.  *Id.* ¶ 15.  Mr. Bosley explains that during this meeting, Mr. Olson had attempted to recruit Mr. Bosley to join Mr. Olson's new company, GFI, with promises of ownership and other major benefits.  *Id.* ¶¶ 17–19.  Mr. Olson also allegedly "explained that his strategy was to recruit the leaders of the [WFG] teams first, then allow each leader to bring their teams with them."  *Id.* ¶ 24.

WFG also submitted declarations from others who apparently (1) were similarly approached and recruited to join WFG in this timeframe (*e.g.*, ECF No. 16-1, Shorak Decl. and Maginnis Decl.), (2) saw messages in a "GroupMe" chat for Mr. Olson's hierarchy discussing what WFG contends are lies about WFG (*e.g.*, ECF No. 16-1, Novosel-Lingat Decl.), and (3) attended a presentation hosted by GFI that showed a business model, hierarchy structure, and compensation arrangements that are substantially similar to WFG's confidential processes (*id.*)[2]. WFG contends that these declarations demonstrate the Olsons' "Anchor Leg" strategy, which involved encouraging high-performing insurance agents in other hierarchies to move their books of business and downline hierarchy to their spouse, who would join Olsons' team.  TRO 3.

In addition to their own declarations, the Olsons submitted declarations from others who discuss the allegedly threatening nature of working at WFG (ECF Nos. 31, Resendez Decl. and 32, Cofield Decl.) and the circumstances regarding GFI's inception (ECF Nos. 33, Welsh Decl. and 34, Hart Decl.).

## II.    LEGAL STANDARD

Requests for temporary restraining orders are governed by the same general standards that govern the issuance of a preliminary injunction.  *Taimani v. Residential Mortg. Loan Tr. 2013-TT2*, No. 16-CV-02992-YGR, 2016 WL 9175877, at *1 (N.D. Cal. June 7, 2016) (citing *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n.2 (1977)).  A preliminary injunction is an "extraordinary and drastic remedy" that is never awarded as of right.  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal citations omitted).  Whether seeking a temporary

---

[2] Ms. Olson disputes that this presentation was directed to WFG agents.  Ms. Olson Decl. ¶ 21. Rather, she alleges that Mr. Welsch "posted information about this Zoom presentation on his publicly available social media, and the entire world was able to view it."  *Id.*

1    restraining order or a preliminary injunction, a party must establish four factors: (1) it is likely to

2    succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary

3    relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.

4    *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "Moreover, a district court should

5    be wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted

6    by plaintiff."  *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990)

7    (citing *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1471 (9th Cir. 1985)).

8    **III.    DISCUSSION**

9        **A.    Jurisdiction**

10         As an initial matter, the parties dispute whether this matter was properly removed to this

11   Court.  WFG contends that the Olsons, as California citizens, cannot remove the complaint on the

12   basis of diversity jurisdiction because of the forum defendant rule.  The Olsons disagree,

13   contending that removal is not barred because Mr. Olson had not been properly served when the

14   case was removed.

15         In general, only those state court actions that could have been originally filed in federal

16   court may be removed.  28 U.S.C. § 1441(a).  Accordingly, the removal statute provides two basic

17   ways in which a state court action may be removed to federal court: (1) the case presents a federal

18   question, or (2) the case is between citizens of different states and the amount in controversy

19   exceeds $75,000.  *Id.* §§ 1441(a), (b).  The forum defendant rule provides that "[a] civil action

20   otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title may

21   not be removed if any of the parties in interest properly joined and served as defendants is a citizen

22   of the State in which such action is brought."  *Id.* § 1441(b)(2).  The rule "confines removal on the

23   basis of diversity jurisdiction to instances where no defendant is a citizen of the forum state."

24   *Lively v. Wild Oats Mkts., Inc.*, 456 F.3d 933, 939 (9th Cir. 2006); *see also Spencer v. U.S. Dist.*

25   *Court for N. Dist. of Cal.*, 393 F.3d 867, 870 (9th Cir. 2004) (holding that "the presence of a local

26   defendant at the time removal is sought bars removal").

27         **1.    Snap Removal**

28         At issue is Mr. Olson's use of "snap removal"—"[t]he practice of circumventing

*United States District Court*
*Northern District of California*

application of the forum-defendant rule by removing before defendants are served." *Lam Sing v. Sunrise Senior Mgmt., Inc.*, No. 23-cv-00733-WHA, 2023 WL 3686251, at *3 (N.D. Cal. May 26, 2023). As the court explained in *Lam Sing*, "[s]nap removal may apply in a situation where a defendant *was able to remove* ... and argue against application of the forum defendant rule because it managed to remove the case before [plaintiff] was able to serve it." *Id.* (emphasis in original) (citing *Aetna Inc. v. Gilead Scis., Inc.*, 599 F. Supp. 3d 913, 918 (N.D. Cal. 2022)).

The Ninth Circuit has not yet decided whether snap removals under section 1441(b) are appropriate, and district courts appear split on the issue. Although courts outside of this district vary in their interpretation of section 1441(b)(2), the Northern District of California "has consistently held a defendant may remove an action prior to receiving proper service, even when the defendant resides in the state in which the plaintiff filed the state claim." *Humana Inc. v. Handa Pharms., LLC*, No. 23-cv-01550-DMR, 2023 WL 5227191, at *3 (N.D. Cal. Aug. 15, 2023) (quotations omitted) (collecting cases). But the decision to allow snap removals is not unanimous in this District. *See In re Roundup Prod. Liab. Litig.*, No. 16-MD-02741-VC, 2019 WL 423129, at *1 (N.D. Cal. Feb. 1, 2019) ("[T]his Court agrees with the view that interpreting the statute to permit removal before service of process would create absurd results"). WFG acknowledges this majority view but contends that "snap removal has never arisen in circumstances on all fours with these, particularly in the unique posture of a TRO application." Reply 9. The Court will follow the majority view on this issue but recognizes that removal based on the literal interpretation of section 1441(b)(2) can promote gamesmanship under certain circumstances—including circumstances that may have been present here.

Here, "snap removal" was appropriate only if Mr. Olson removed the case prior to being properly served. The sufficiency of service of process prior to removal is "strictly a state law issue," and is therefore analyzed under California law in this case. *Gonzalez v. Lightcap*, No. 18-cv-01236-VAP-SHKX, 2018 WL 3753019, at *3 (C.D. Cal. Aug. 7, 2018) (citing *Lee v. City of Beaumont*, 12 F.3d 933, 936–37 (9th Cir.1993), *overruled on different grounds, California Dept. of Water Resources v. Powerex Corp.*, 533 F.3d 1087, 1091 (9th Cir. 2008)). Under California law, when a defendant challenges the effectiveness of service, the plaintiff has the burden to show

1    that service was proper.  *Id.*

2         Below is the relevant timeline of actions concerning service.

3    - January 22: David Spalten emailed counsel for WFG to advise he represented
4      Mr. Olson, but not Ms. Olson.  Mr. Spalten stated that "all pleadings and other
     documents of record should be served on me at this email address
5      contemporaniously [sic] with their filing with the court."  ECF No. 39-1, Hynes
     Decl., Ex. I.
6

7    - January 24: Mr. Spalten emails counsel for WFG again confirming representation
     of Mr. Olson, but not Ms. Olson, and requesting WFG "email [him] service copies
8      of all documents filed for record in any legal proceedings between WFG and Mr. or
     Ms. Olson or her company contemporaneously with their filing."  ECF No. 39-2,
9      Hynes Decl., Ex. J.

10   - January 25 at 12:42pm: WFG's counsel provided notice to Mr. Spalten of WFG's
     intent to seek a TRO against Defendants the next day.  WFG's counsel also stated
11     "please let us know if you are authorized to accept service of WFGIA's complaint
     and moving papers on behalf of your client to avoid the need and expense of
12     effectuating personal service."  ECF No. 39-3, Hynes Decl., Ex. K.

13
14   - January 25 at 4:50pm: WFG's counsel emailed Mr. Spalten and counsel for Ms.
     Olson copies of the filing "being filed with the Court today." ECF No. 39-4, Hynes
15     Decl., Ex. L.

16   - January 25 at 4:57pm: WFG's counsel sent a follow-up email stating "[c]an you
     also let me know whether you are authorized to accept service on behalf of your
17     respective clients."  *Id.*

18   - January 25 at 8:33pm: Counsel for WFG sent copies of the filings to Ms. Olson's
19     counsel and asked "[w]ill you also let me know about service."  *Id.*

20   - January 26: At 1:43am, Mr. Olson, through new counsel, informed WFG's counsel
     that they now represented Mr. Olson and that he was removing the action to federal
21     court.  ECF No. 39-5, Hynes Decl., Ex. M.

22        The parties dispute whether email service was effective.  WFG argues that Mr. Spalten's

23   email advising WFG that he represented Mr. Olson and stating that all pleadings "should be

24   served on me at this email address" demonstrates a clear agreement to service by email.  Reply 7.

25   Mr. Olson argues that service was ineffective because "[u]nder both California and federal law," a

26   complaint cannot be served via email unless the party agrees to accept such service through filing

27   a waiver.  Opp. 8 (citing Fed. R. Civ. P. 4(d) (requiring a waiver to effectuate service through

28   email); Cal. Civ. Proc. Code 415.30 (party is not formally served until its counsel executed a

notice and acknowledgement of receipt)).

*National Foam* found that defendant "was not served formally under California law until its counsel executed the notice and acknowledgment." *National Foam, Inc. v. Zurich American Ins. Co.*, No. 23-CV-03873, 2023 WL 7164914, at *3 (N.D. Cal. Oct. 30, 2023). There, defendant's counsel stated that it would "agree[] to accept service of the complaint" via email but later followed up asking whether "there [is] a form you wanted us to fill out to accept service?" *Id.* at *1. Given the follow-up exchange in which "counsel prompted the plaintiff's counsel to prompt him to send the written acknowledgment," the court found that service was effectuated on the date defendant's counsel signed the notice and acknowledgment of receipt—not the day counsel agreed to accept service via email. *Id.* at *3. The court distinguished *Bathija* where this Court found that email service was sufficient given the parties' "routine, ongoing communications over email prior to the first service, had already agreed that service of process by email could be accomplished for another related action, and ultimately engaged in 'second service' by email." *Bathija v. Vivint Wireless, Inc.*, No. 18-CV-04389-EJD, 2018 WL 5906546, at *4 (N.D. Cal. Nov. 9, 2018). Although defendant later argued it "never consented to receive service of process by email," the Court found that "communications of its counsel belie that argument," particularly because counsel for defendant "never disputed an agreement to accept service by email, nor did he dispute receipt of the courtesy copies." *Id.* (quotations omitted).

Here, in the January 25, 2024 email at 12:42pm, counsel for WFG specifically stated "[a]ddditionally, please let us know if you are authorized to accept service of WFGIA's complaint and moving papers on behalf of your client to avoid the need and expense of effectuating personal service." ECF No. 39-3, Hynes Decl., Ex. K. Counsel for WFG followed up twice more to confirm counsel for the Olsons would accept service. *See* ECF No. 39-4, Hynes Decl., Ex. L (January 25 email at 4:57pm ("Can you also let me know whether you are authorized to accept service on behalf of your respective clients") and January 25 email at 8:33pm ("Will you also let me know about service")). These repeated follow-up emails asking for confirmation regarding service belie WFG's argument that it understood Mr. Spalten had agreed to accept service of the

1    complaint.[3]  Had counsel for WFG understood Mr. Spalten's earlier emails to mean he would

2    accept service, counsel for WFG would have presumably followed up asking for California's

3    service waiver form when serving the complaint, rather than asking explicitly for counsel to "let us

4    know if you are authorized to accept service of WFGIA's complaint."

5           Under these circumstances, the Court finds that the communications between the parties

6    demonstrate service was not deemed effective before the Olsons removed the case to this District.

7    Accordingly, removal was permitted under the literal reading of section 1441(b)(2).

8           **B.      Temporary Restraining Order**

9           To obtain a temporary restraining order, WFG must satisfy a four-factor test, establishing

10   that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence

11   of relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest.

12   *See Winter*, 555 U.S. at 20; *see also DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir.

13   2011) (holding that a plaintiff seeking preliminary injunction "must demonstrate that it meets all

14   four of the elements of the preliminary injunction test").

15                  **1.      Likelihood of Success on the Merits**

16          WFG argues that it is likely to succeed on its causes of action for (1) breach of contract, (2)

17   tortious interference of contract; (3) civil conspiracy, and (4) unfair business practices.

18                         **a.      Breach of Contract**

19          WFG contends that the evidence demonstrates that the Olsons breached (1) the Non-

20   Solicitation Provision, (2) the Confidentiality Provision, and (3) the Non-Disparagement Provision

21   in the Agreement.  As a threshold matter, the parties dispute whether the Agreement's Georgia

22   choice-of-law provision is enforceable.  TRO 9; Opp. 10.  To enforce the Georgie choice-of-law

23   clause, WFG must "demonstrate[] that [Georgia] has a substantial relationship to the parties or

24   their transaction, or that a reasonable basis otherwise exists for the choice of law."  *Wash. Mutual*

25   *Bank v. Superior Ct.*, 24 Cal.4th 906, 917 (2001).  Georgia law will not apply if it is "contrary to a

---

[3] The Court recognizes that, given the time of removal late at night, new counsel for the Olsons appear to have deliberately intended to take advantage of "snap removal" with no notice to WFG. The Court disapproves of tactics intended to gain leverage by surprise and frowns on such tactics going forward.

11

fundamental policy" of California, and California "has a materially greater interest in the determination of the particular issue." *Id.* To demonstrate the ties to Georgia, WFG highlights that (1) both WFG and Defendants are registered to do business in Georgia, (2) at the time the parties entered into the Agreement, WFG had its headquarters in Georgia, and (3) WFG has current employees working in Georgia. Reply 11. Despite this connection, the Court finds that Georgia law conflicts with California law in this instance, and California has a materially greater interest in the determination of this issue, which involves interpreting a contract that invokes restraints on its citizens' employment. *See Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1323–24 (9th Cir. 2012). Accordingly, the Court will apply California law.

### i.  Cal. Bus. & Prof. Code § 16600

Whether WFG is likely to succeed on the merits of its breach of contract claim turns on the application of § 16600 to the Agreement. Section 16600 provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600(a). Section 16600 "shall be read broadly, in accordance with Edwards v. Arthur Andersen LLP (2008) 44 Cal.4th 937, to void the application of any noncompete agreement in an employment context, or any noncompete clause in an employment contract, no matter how narrowly tailored, that does not satisfy an exception in this chapter." *Id.* at (b)(1).

First, the parties dispute whether Section 2.15 of the Agreement should be treated as a non-solicitation provision or a non-compete provision. WFG argues, relying on *Loral*, that this distinction matters because the former can be permitted under certain circumstances, but the latter is voidable. WFG Suppl. 1. Mr. Olson argues that "the overlapping restrictions [in the Agreement] restrain any departing agent from competing against WFG," so the Agreement, at bottom, amounts to a restraint on employee mobility and is thus void under section 16600. Olson Suppl. 1.

*Edwards* held that "Section 16600 is unambiguous, and if the Legislature intended the statute to apply only to restraints that were unreasonable or overbroad, it could have included language to that effect." *Edwards*, 44 Cal. 4th at 950 (rejecting contention that court "should

12

United States District Court
Northern District of California

1   adopt a narrow-restraint exception to section 16600").  Prior to *Edwards*, *Loral Corp. v. Moyes*

2   found that an agreement which was more akin to "a restraint on solicitation of customers or on

3   disclosure of confidential information" than a noncompete agreement was upheld. 174 Cal.App.3d

4   268, 276 (1985) ("*Loral*").  The court reasoned that the agreement only slightly affected the

5   plaintiff's employees because they were not hampered from seeking employment with defendant's

6   new employer; nor did the agreement prevent the plaintiff's employee from contacting the

7   contracting defendant.  The only option employees lost was the option of being contacted by the

8   defendant first.  *Id.* at 279–80.  The court further reasoned that "[t]he restriction presumably was

9   sought by plaintiffs in order to maintain a stable work force and enable the employer to remain in

10  business."  *Id.* at 280.  Thus, since the court found that the noninterference agreement "ha[d] the

11  apparent impact of limiting [defendant's] business practices in a small way in order to promote

12  [the employer's] business," it did not find the agreement to be void on its face under section

13  16600.  *Id.*

14      WFG argues that *Edwards* "could not have diminished the holding in *Loral* because the

15  *Edwards* court did not address the issue of non-solicitation agreements, and the issue was not

16  raised in the Court of Appeal."  WFG Suppl. 1.  Courts have considered the impact of the

17  *Edwards'* holding on *Loral*.  For instance, *AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*

18  expressly stated that it "doubt[s] the continuing viability of [*Loral*] post-*Edwards*" but

19  nevertheless evaluated the agreement at issue using the *Loral* reasonableness standard.  28 Cal.

20  App. 5th 923, 939 (2018).

21      Other courts, in evaluating the two cases vis-à-vis, have similarly questioned whether non-

22  solicitation agreements permitted in *Loral* remain so following *Edwards*.  For example, *Race*

23  *Winning Brands, Inc. v. Gearhart* evaluated a confidentiality agreement that stated plaintiff must

24  not, "for one year following the termination of [his] employment ... directly or indirectly through

25  another person or entity, induce or attempt to induce any employee of [plaintiff] to suspend,

26  decrease or terminate their employment or otherwise interfere with the relationship ...."  No. 22-

27  CV-1446-FWS-DFM, 2023 WL 4681539, at *9 (C.D. Cal. Apr. 21, 2023).  This is nearly identical

28  to the Non-Solicitation Provision in the Agreement here.  The court explained that, before *Ixchel*,

"several district courts considering *AMN* followed its interpretation that § 16600 broadly invalidates non-solicitation agreements imposed on terminated employees. *Id.* (citing *Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 827-28 (N.D. Ill. 2019) (finding AMN's interpretation of *Edwards* persuasive notwithstanding *Loral* and noting some decisions issued after *Edwards* but before *AMN* upheld non-solicitation agreements)).  The court held that the non-solicitation clause "contained in an employment agreement" which "prevents Defendant from soliciting Plaintiff's other employees to work with Defendant for one year following his termination" was void under section 16600 absent a statutory exception. *Id.* at \*11; *see also Parsable, Inc. v. Landreth*, No. 22-CV-01741-CRB, 2022 WL 19692034, at \*3 (N.D. Cal. Aug. 5, 2022) (holding non-solicitation clause in confidentiality agreement "void and unenforceable under California law" even where employee was not in business of recruiting because "[a] non-solicitation clause works a restraint on any former employee by restricting who may work alongside them") (quotations omitted); *Minnesota Life Ins. Co. v. Link-Allen & Assocs., Inc.*, No. 20-CV-06082-RS, 2021 WL 9860789, at \*4 (N.D. Cal. Jan. 22, 2021) (explaining that California's protection under section 16600 "brooks no exception when it comes to non-solicitation clauses" and collecting cases); *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 852 (N.D. Cal. 2019), *modified in part*, No. 18-CV-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019) (finding non-solicitation provision void under section 16600 and rejecting argument that *AMN* departed from *Loral*).

Faced with the sizeable body of caselaw in this district and others, the Court finds that *Edwards*, at a minimum, cast doubt on *Loral*.  Moreover, the Olsons have stated that they *are* in the business of recruiting, so the non-solicitation provision would "actually have a negative impact" on their business.  *See AMN Healthcare*, 28 Cal. App. at 939; *see also NuLife Ventures v. Avacen*, No. 20-cv-2019-BAS-KSC, 2020 WL 7318122, at \*11 (S.D. Cal. Dec. 11, 2020) (finding plaintiff failed to demonstrate a probability of prevailing on the merits of its breach of contract claim where the contractual provisions at issue "restrict [the independent contractor's] ability to practice their sales profession in the MLM industry, which rely on a sales agent's recruitment of new sales agents").  That both Olsons have alleged that the Agreement's prohibition on

solicitation would impact their chosen post-WFG career also distinguishes this case from *Hamilton*. *See Hamilton v. Juul Labs, Inc.*, No. 20-CV-03710-EMC, 2020 WL 5500377, at \*1 (N.D. Cal. Sept. 11, 2020) ("*Loral* holds that the NDA's non-solicitation provision must actually have a negative impact on [plaintiff's] trade or business in order to be declared void" and distinguishing *AMN Healthcare* where plaintiff "[did] not allege that a prohibition on solicitation has any effect on her chosen post-[employer] career"); Ms. Olson Decl. ¶ 23 ("A primary function of my job at GFI is to recruit agents in the insurance industry"); Mr. Olson Decl. ¶ 29 (same). This is underscored by the compensation structure outlined in the Agreement, which provides that "Agent is compensated under this Agreement only from the sale or referral of the Products and Services offered through WFG by Agent *or Agent's Downline Agents*." Agreement § 3.1 (emphasis added).

Second, even if *Loral* is still good law, the parties disagree on how to characterize the relationship between WFG and Mr. Olson. The answer impacts how the Agreement should be evaluated. On this point, *Ixchel* again bears noting. There, the California Supreme Court declined to extend *Edwards* and explained that "[i]n context, section 16600 is best read not to render void per se all contractual restraints on business dealings, but rather to subject such restraints to a rule of reason." *Ixchel Pharma v. Biogen*, 9 Cal. 5th 1130, 1150 (2020). *Ixchel* confirmed *Edwards'* holding that "section 16600 prohibits employee noncompetition agreements unless the agreement falls within a statutory exception" is still good law. *Id.* at 1158 (quoting *Edwards*, 44 Cal. 4th at 942). But the court clarified that *Edwards* did not touch "whether noncompetition agreements *outside the employment context* are per se invalid." *Id.* (emphasis added). The Court noted *Edwards* "focused on policy considerations specific to employment mobility and competition" and relied on "cases exclusively from the employment context." *Id.*

The Court agrees with Defendants that their relationship with WFG is more appropriately characterized as falling "in the employment context" as opposed to one of "business-to-business." WFG argues that the Agreement's language stating that WFG will provide Agent with "a platform through which Agent can, if Agent chooses build Agent's business" and that the parties "shall operate their respective businesses separately and independently of each other throughout the

duration of this Agreement" demonstrates a business-to-business relationship. Suppl. 4–5 (citing the Agreement at 1, § 2.8). However, the Agreements at issue are between WFG and Mr. Olson, the individual, and WFG and Ms. Olson, the individual. *See* Olson Decl., Ex. 1. Other aspects of the Agreement support characterizing the relationship as falling within an employment context. For instance, the Agreement states that it is "not a franchise agreement." Agreement § 6.4. Additionally, all agents in Mr. Olson's hierarchy are paid directly by WFG (*id.* §§ 3.1–3.7) and WFG can "in its sole discretion" terminate Mr. Olson (*id.* § 4.3). If the Agreement were between two businesses, as WFG contends, one would expect that the Agreement would be between WFG and Pinnacle (Mr. Olson's business), or Mr. Olson would pay the individual agents in his hierarchy.

Additionally, WFG has not cited, and this Court is not aware of, any cases where an individual was treated as a business for a section 16600 analysis under *Ixchel*. Under these circumstances, the Court will not treat the Agreement as one between two businesses and thus will evaluate whether the provisions are void under the *Edwards* framework.

Section 2.15—the Non-Solicitation Provision. For the reasons explained above, the Court finds that WFG has not demonstrated a likelihood of prevailing on the merits of its breach of contract claims grounded on the Non-Solicitation Provision.

Section 2.16—the Confidentiality Provision. Mr. Olson argues that the Confidentiality Provision is void under section 16600 for being "unreasonably restrictive," including because the provision "only carves out information that *WFG* has made public and makes no effort to tailor the scope of the clause to information that holds any competitive value to WFG." Opp. 16. WFG responds that the provision contains limiting principles that make it valid, enforceable, and consistent with confidentiality provisions other courts have upheld. TRO 12–13.

The Confidentiality Provision prohibits any "use and dissemination" of any "Confidential Information" defined as "[a]ny and all Personally Identifiable Information or confidential and proprietary records, data or information created by or on behalf of, or belonging to, WFG and now or hereafter acquired by, made known or disclosed to the Agent or any Assistant which has value to, and is not generally known by, competitors or potential competitors of WFG, and includes but

16

1   is not limited to hierarchy lists and Personally Identifiable Information deemed to be confidential

2   by applicable federal, state, commonwealth, and/or local laws and list(s) of WFG agents, including

3   their identities and contact information."  Agreement § 1.8.  Confidential information defined

4   under this section does not include "information which becomes generally available to the public

5   other than as a result of disclosure by the Agent, any Assistant or any member of WFG's network

6   of contractually affiliated agents."  *Id.*

7          The Court finds that the Confidentiality Provision, while broad, is not so broad to be void

8   under section 16600.  Unlike the confidentiality provision in *Brown*, which defined confidential

9   information as any information that is "usable in" or "relates to" the entire securities industry, the

10  Confidentiality Provision here is tailored to personally identifiable information or confidential

11  information "created by or on behalf of" or "belonging to" WFG.  *Brown v. TGS Mgmt. Co., LLC*,

12  57 Cal. App. 5th 303, 317, *as modified on denial of reh'g* (Nov. 12, 2020); Agreement § 2.16.

13  The Agreement's exceptions for information WFG has disclosed would seemingly exclude

14  information the Olsons argue is already public, including any information regarding hierarchy lists

15  published online.  ECF Nos. 28-8, 28-9, Borden Decl., Exs. 8–9.

16         Turning to whether WFG has demonstrated a likelihood of success on the merits with

17  respect to its claim for breach of the Confidentiality Provision, the Court finds that, at this stage, it

18  has not.  WFG argues "Defendants revealed WFG's compensation structure" on a "public Zoom

19  meeting" and also used WFG's hierarchy structure and lists to "identify which WFGIA insurance

20  agents to target for recruitment to GFI."  Reply 13.  The presentation does not appear to have been

21  made by the Olsons, and the Olsons have presented evidence raising doubt as to whether the

22  information presented would fall under the scope of the Confidentiality Provision.  *See, e.g.*,

23  Novosel-Lingat Decl. ¶¶ 6–12 (Zoom presentation made by former WFG agent, not the Olsons);

24  Borden Decl., Exs. 8–9 (information regarding hierarchy and business model made public by

25  WFG); Mr. Olson Decl. ¶ 30 (stating the Mr. Olson "did not create or provide instruction

26  regarding [the] presentation"); Welsh Decl. ¶ 16 ("The Zoom was not directed at WFG agents, I

27  never mentioned WFG during the presentation, and the Zoom was public").

28         The Court finds WFG's evidence insufficient at this stage to demonstrate a likelihood of

1   success of prevailing on the merits for of its breach of contract claims grounded on the

2   Confidentiality Provision.

3   <u>Section 2.17—the Non-Disparagement Provision</u>.  Finally, the Non-Disparagement

4   Provision prohibits "disparaging WFG or its affiliates" and states that agents "shall not do

5   anything that will damage the business, good name or reputation of WFG, Affiliated Companies

6   and/or their respective officers, directors, and employees."  Agreement, § 2.17.  WFG argues that

7   the Olsons "have spread false, disparaging rumors about WFGIA with the intention of causing—

8   and the actual result of causing—detrimental reliance on those statements."  Reply 17.  To

9   demonstrate the Olsons' breach of the Non-Disparagement Provision, WFG relies chiefly on

10   declarations describing how the Olsons have spread rumors of WFG's policies regarding a transfer

11   of "codes" from deceased to surviving spouses.  Reply 18.  But only one declaration appears to

12   discuss *Mr. Olson's* statements.  *Compare* Bosley Decl. ¶¶ 12–15 (recounting conversation with

13   Mr. Olson directly) *with* Day Decl. ¶¶ 15, 20 (discussing generally "scare tactic that GFI has used"

14   and referring to statements made by Dajuan Cofield).  The Olsons have submitted declarations of

15   their own regarding these statements.  *See* Olson Decl. ¶ 14 (discussing WFG cancelling its

16   "Heritage Program" which permits transfer of code to spouses); Cofield Decl. ¶¶ 16–17 (stating

17   that "[n]either my wife nor I have ever been part of any solicitation effort on behalf of GFI" and

18   "Eric [Olson] has never once asked us to join GFI.").

19   Again, the Court finds the evidence insufficient at this stage to establish a likelihood that

20   WFG will prevail on the merits of its breach of contract claims grounded on the Non-

21   Disparagement Provision.

22   **b.   Tortious Interference of Contract**

23   "In order to state a claim for tortious interference with a contract, a plaintiff must plead (1)

24   a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3)

25   defendant's intentional acts designed to induce a breach or disruption of the contractual

26   relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting

27   damage."  *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990) (citations

28   omitted).  Because the Court finds that WFG has not established a likelihood of success on the

United States District Court
Northern District of California

merits of its breach of contract claim, WFG has not established the fourth element of its tortious interference claim—an actual breach of the Agreement.  Accordingly, WFG has not established it is likely to succeed on the merits of its tortious interference claim.

### c.    Civil Conspiracy

To prove a civil conspiracy, a plaintiff must show "the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design . . . ." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 511 (1994).  Given the competing evidence, and because WFG's civil conspiracy claim is derivative of its breach of contract claim, the Court cannot find that WFG has established it is likely to succeed on the merits of its civil conspiracy claim.

### d.    Unfair Business Practices

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice."  Bus. & Prof. Code, § 17200 (codifying three disjunctive "prongs" of UCL as "unlawful," "unfair," or "fraudulent").  WFG argues that "Defendants' operation, association, and direction of GFI is achieved under unlawful means because it all raises under independently-actionable conduct" and "Defendants' use of GFI violates the 'unlawful' prong because their use of WFGIA's confidential and proprietary information gave them (and still gives them) an advantage regarding which insurance agents to target."  TRO 13.  Because the Court finds that WFG has not established a likelihood of success on the merits of its breach of contract claim, WFG similarly has not established that it is likely to succeed on the merits of its derivative UCL claim.  *See AMN Healthcare*, 28 Cal. App. 5th at 950 ("when the underlying legal claim fails, so too will a derivative UCL claim").

### 2.    Irreparable Harm, the Balance of Equities, and the Public Interest

Because WFG has failed to show a likelihood of success on the merits, the Court need not address the remaining factors.  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (internal quotation marks and brackets omitted) ("Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, [the Court] need not consider the remaining three *Winter* elements").

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

C.       Motion for Expedited Discovery

In conjunction with its TRO, WFG filed a motion for expedited discovery.  ECF No. 17.

Courts in the Ninth Circuit permit early discovery if the requesting party demonstrates good cause.

*Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002).  "Good cause

may be found where the need for expedited discovery, in consideration of the administration of

justice, outweighs the prejudice to the responding party."  *Id.*  In determining whether good cause

justifies expedited discovery, courts commonly consider the following non-exhaustive factors:

"(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the

purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with

the requests; and (5) how far in advance of the typical discovery process the request was made."

*MedImpact Healthcare Sys., Inc. v. IQVIA Holdings, Inc.*, No. 19-CV-1865-GPC-LL, 2019 WL

6310554, at *2 (S.D. Cal. Nov. 25, 2019).

WFG argues that good cause exists here for multiple reasons, including because (1)

"Defendants' active misuse of WFGIA's confidential and proprietary information, disparagement

of WFGIA, and inducement of WFGIA's insurance agents and customers," (2) defendants are

using "the encrypted and self-destroying messaging application Signal to hide and/or erase

relevant conversations," (3) WFG claims defendants have engaged in unfair business practices to

unlawfully compete with WFG, and these are the types of claims that warrant expedited discovery,

and (4) WFG cannot identify all defendants and needs discovery to identify them.  ECF No. 17 at

3–4.

The Olsons argue that (1) simply filing a TRO does not justify expedited discovery, (2)

WFG lacks evidence demonstrating a risk that evidence could be destroyed, (3) WFG's authority

is distinct because it involves claims not alleged here, and (4) allowing expedited discovery to

identify the Doe defendants would put the cart before the horse.  ECF No. 43 at 4–5.  The Olsons

also argue that WFG has not attached the requested discovery so it cannot evaluate the scope, and

the requested relief would prejudice Ms. Olson's new business by "[g]iving WFG access to the

identities of GFI agents and other individuals who may have been involved with GFI."  *Id.* at 5–6.

The Court finds that good cause exists to permit limited expedited discovery.  WFG has

United States District Court
Northern District of California

provided evidence showing that defendants use an encrypted messaging service, and the alleged events are unraveling rapidly, including a "major conference in Hawaii in early March." ECF No. 60 at 5. Additionally, the Olsons' stated prejudice is not persuasive because presumably WFG will have access to the identities of GFI agents during the normal course of discovery. Nevertheless, the Court finds at this time it cannot properly evaluate whether the requests are narrowly tailored. Accordingly, the Court DEFERS ruling on the extent of expedited discovery and ORDERS WFG to file a proposed order identifying the specific document requests, interrogatories, and third-party witness subpoenas it seeks within three days of this Order.

## IV.    CONCLUSION

For the foregoing reasons, WFG's motion for temporary restraining order is DENIED. WFG's motion for expedited discovery is DEFERRED as described above.


**IT IS SO ORDERED.**


Dated: February 22, 2024

Edward J. Davila
United States District Judge